IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SANDRA LADIK, PENNY PERKINS,
JACKIE GOEBEL, MARIE COGGINS
and SONDRA STEEB-LAMB, on behalf
of themselves and all others similarly situated,

                        Plaintiffs,

           v.

WAL-MART STORES, INC.,

                      Defendant.

                               OPINION AND ORDER

                                     13-cv-123-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This is a lawsuit brought under Title VII of the Civil Rights Act of 1964 by plaintiffs Sandra Ladik, Penny Perkins, Jackie Goebel, Marie Coggins and Sondra Steeb-Lamb, who are current or former employees of defendant Wal-mart Stores, Inc. Each plaintiff would have been a class member in <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541 (2011), a case involving allegations of companywide sex discrimination, but the Supreme Court denied class certification on the ground that the plaintiffs had not shown any common questions of law or fact as required by Fed. R. Civ. P. 23(a)(2).  In this case, plaintiffs are alleging again that defendant has engaged in widespread sex discrimination in both pay and advancement opportunities, but they seek to represent a smaller class involving only employees in "Region 14," which includes Wisconsin, Illinois, Indiana and Michigan.  In particular, plaintiffs' proposed class includes women who have been employed by defendant

in that region since December 26, 1998 and "who have been or may be subject to" a denial of a promotion or equal pay.

Three motions filed by defendant are before the court: its motion to dismiss the class allegations and two motions to take judicial notice of various documents it filed with its motion to dismiss. Dkt. ##16, 18 and 32. In its motion to dismiss, defendant argues that plaintiffs cannot proceed as a class action for two reasons: (1) the statute of limitations has run since plaintiffs filed this case and the potential class members are not entitled to tolling; and (2) the complaint does not identify a common question of law or fact as required by Fed. R. Civ. P. 23. Alternatively, defendant argues that any class certified must be limited to those who have filed administrative charges with the Equal Employment Opportunity Commission and who have claims that may be brought in Wisconsin under Title VII's venue requirements.

Although I conclude that the statute of limitations does not bar the claims of the proposed class members, I am granting defendant's motion to dismiss because plaintiffs have failed to identify any common questions of law or fact. In particular, they have not shown how the class they propose solves any of the problems the Court found in Dukes. This makes it unnecessary to consider defendant's arguments about exhaustion and venue. I am denying the motions to take judicial notice because it was not necessary to consider any of the documents in order to resolve the motion to dismiss.

In concluding that plaintiffs cannot proceed as a class action, I do not mean to question the seriousness of the allegations in the complaint. These allegations paint a

disturbing picture about defendant's attitude and treatment of its female employees over the course of many years.  If true, they demand immediate and comprehensive action by defendant to investigate and correct the problems.  However, even the most serious problems cannot always be resolved by a class action lawsuit.  In <u>Dukes</u>, the Supreme Court established a rigorous standard for courts to apply in assessing whether far-reaching cases such as this one comply with the federal rules.  Because plaintiffs' complaint does not meet that standard, I must grant defendant's motion to dismiss.

Plaintiffs fairly allege the following facts in their complaint.

ALLEGATIONS OF FACT

A.  <u>Defendant's Policies and Practices</u>

Defendant Wal-Mart Stores, Inc. owns retail stores throughout the country, including Wisconsin, Illinois, Indiana and Michigan.  This case involves employees in defendant's "Region 14," which covers areas in those four states.

Within Region 14, support managers are the highest level hourly supervisory positions and they assume the duties of assistant managers when necessary.  Defendant often selects employees for these positions arbitrarily through what is referred to as a "tap on the shoulder" promotional system.  Employees in these positions are often groomed for further advancement.

Before 2004 defendant had no system for posting positions for the management training program.  No formal application process or job-related criteria for making selections

existed for these positions.

In January 2003,  defendant instituted a "one-time, online application process" for entry into the management training program.  Potential applicants were required to accept the conditions that they would travel for up to six weeks at a time and be subject to a varied and irregular schedule.  Failure to accept these conditions precluded consideration as an applicant.

In 2006 defendant adopted a "formalized" application process  for certain positions called the "career preferences program."  However, female employees who qualified for the program have complained that they were not selected to be interviewed.  For example, Margie Bracken never heard about promotion opportunities until after male employees received the promotions.   In addition, female employees have complained of unwarranted "coaching" and progressive discipline after showing interest in a promotion through the program. For example, when defendant posted a new management position, Tammy Nichols was frequently coached for minor issues, which disqualified her for the promotion.

Entry into the management training program is a requirement for advancement into salaried management positions.  However, before 2006, hourly employees in Region 14 were not provided any information about how to become a manager, what the requirements or qualifications were or how to apply for the program.  Even after defendant initiated the career preferences program in 2006, "the tap on the shoulder" system continued, with management instructing certain people to apply when openings arose without regard to objective criteria.

4

Defendant has "uniform guidelines" establishing minimal eligibility criteria for promotion into the management training program. These include minimum tenure, age, absence of current "active" discipline, satisfactory recent performance evaluation and willingness to relocate. However, managers retain the ability to make subjective judgments. (Defendant's founder, Sam Walton, conceded in 1992 that the relocation requirement creates unnecessary barriers to female advancement.)

Regional vice presidents select co-managers, subject to approval by the divisional senior vice president. The minimal eligibility requirements for promotion to co-manager include satisfactory performance and willingness to relocate, but there are no job-related criteria for making selections among those who meet the minimum requirements or in determining where to assign a new co-manager.

## B. Gender Disparities

Female employees in Region 14 have been much less likely than their male counterparts to receive promotion to management track positions, even when they possess equal or better qualifications than their male counterparts. Females employed in Region 14 must wait significantly longer to be promoted into management track positions than men with equal or lesser qualifications. Defendant's "management" is aware of gender disparities in promotions in Region 14 and has failed to take any remedial action.

### C.  Discriminatory Attitudes

A 1998 survey of Wal-Mart managers revealed that there was a "good ol' boy philosophy" at the company, that many managers were "close minded" about diversity in the workplace and that district managers "don't seem personally comfortable with women in leadership roles."  A committee of defendant's few female executives reported that "stereotypes limit the opportunities offered to women."

On January 24, 2004, at a meeting of all of defendant's district managers presided over by chief executive officer Thomas Coughlin, the district managers were told that the key to success is a "single focus to get the job done . . . women tend to be better at information processing.  Men are better at focus[ing on a] single objective."

At a training at defendant's Walton Institute, managers were advised that there are fewer female managers because men are "more aggressive in achieving those levels of responsibility" than women.  Managers were cautioned that efforts to promote women could lead to the selection of less qualified women over more qualified men.

### D.  Incidents of Discrimination: Named Plaintiffs

Plaintiffs Sandra Ladik, Penny Perkins, Jackie Goebel, Marie Coggins and Sondra Steeb-Lamb are residents of Wisconsin.  Ladik worked for defendant from 1992 to 2006; Perkins worked for defendant from 1998 until 2010; Coggins worked for defendant at various intervals between 1988 and 2010; Steeb-Lamb worked for defendant from 2000 to 2008; Goebel has worked for defendant since 1988.

6

Plaintiff Ladik held various jobs at defendant's store in Portage, Wisconsin, including manager of the maintenance department. In 2001 or 2002 she became aware that a male employee she trained made a significantly higher wage than she did, even though she had more experience and responsibility than he did. Later, she learned that many other male department heads were making more money than she was and that many men she trained started at a wage she did not receive until she completed many years of service.

Plaintiff Perkins worked as a department manager at defendant's Beloit, Wisconsin store. She received only one merit raise during the 12 years that she worked for defendant, even though a male associate who had less experience than she did received six merit raises during the same time period. Despite her consistently positive performance, Perkins received smaller annual percentage raises than male coworkers.

Plaintiff Goebel believes that it is common knowledge around the store in Kenosha, Wisconsin that men are paid more than women for the same work. When plaintiff was a "pay grade 6," she learned that a male coworker who was a "pay grade 2" made "only a penny less than" she did. Goebel has not received a raise in six years.

Plaintiff Coggins worked at various stores in southern Wisconsin and northern Illinois. Throughout this time, men were paid more for the same work that she did. When plaintiff transferred to the Janesville, Wisconsin store in 1997, she was hired as a cashier even though she was qualified to serve as a department manager. In 2009, plaintiff expressed interest in salaried management positions, but she was not even considered for an interview, despite her exemplary performance. Defendant gave the position to a man from

another store with less experience.

Plaintiff Steeb-Lamb began working for defendant at the same time as her husband. Despite being "comparable in every way," she was paid less than he was.  After plaintiff completed the management training program, she was assigned to the bakery department at the Wisconsin Dells store.  This was the worst assignment in the area because the department was poorly run and had very little profit, which effectively prevented Steeb-Lamb from moving up in management.

Plaintiff Steeb-Lamb received many "coachings" from her store manager, many of which were for insignificant issues.  (Plaintiffs do not explain what "coachings" are, but I assume that they are a form of reprimand.) During her year in management training, defendant terminated three female assistant managers.  Frustrated with the unfair treatment she received, plaintiff returned to work as an hourly associate.

### E.  Incidents of Discrimination:  Potential Class Members

Miriam Briggs-Muhammed worked for defendant "on and off" from 1975 to 2008. Despite a long employment history with defendant and successful completion of the tests, the personnel manager rejected her for the management training program on the ground that she was "not management material."

When Carol Frendling asked "management" why male assistant managers were not required to work extended hours like female assistant managers, they told her that male assistant managers "ha[d] families to go home to." Kathleen Cole's manager explained that

8

the reason for the disparity between her pay and her male counterpart's pay was defendant's "philosophy" that men were paid more because they were heads of the household and they had families to support.

Male managers made derogatory comments to Delorah Mims, such as, "if you were a man, you would know."


OPINION

A.  Statute of Limitations

Defendant's first argument relates to the proper scope of two decisions by the Supreme Court regarding the extent to which a class action tolls the limitations period for subsequent lawsuits.  In American Pipe & Construction Co. v. Utah, 414 U.S. 538, 553 (1974), the Supreme Court held that "[t]he commencement of [an] original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status."  The Court reasoned that a contrary rule would undermine the efficiency purpose of Rule 23 because it would require all potential class members to join the suit or file motions to intervene at the outset of the case or risk losing their claims in the event the court refused to certify the class.  Id. at 553.  In addition, tolling would not undermine the purpose of the statute of limitations because the class representatives will have given the defendant notice "not only of the substantive claims being brought against [it], but also of the number and generic identities of the potential plaintiffs who may participate in the judgment."  Id. at

555.

In <u>Crown, Cork & Seal Co., Inc. v. Parker</u>, 462 U.S. 345, 350 (1983), the Court extended the rule of <u>American Pipe</u> to toll the limitations period not just for intervenors but for class members who filed their own lawsuits as well.  The Court repeated its concern that a contrary rule would encourage the filing of unnecessary protective lawsuits before the limitations period expired.  <u>Id.</u> 350-51.  In addition, the Court noted that there are a number of legitimate reasons why class members might want to file their own lawsuits, such as to obtain a more convenient forum or more control over the litigation.  <u>Id.</u> at 350.

The parties agree that, under the tolling principles in <u>American Pipe</u> and <u>Crown, Cork & Seal</u>, the named plaintiffs filed the complaint in this case within the limitations period. They also agree that the limitations period for all the claims raised in this case has since expired.  The question raised in defendant's motion is whether the filing of *this* lawsuit tolled the statute of limitations for potential class members not named in the complaint.

The closest that the Court of Appeals for the Seventh Circuit has come to answering this question was in <u>Sawyer v. Atlas Heating and Sheet Metal Works, Inc.</u>, 642 F.3d 560 (7th Cir. 2011).  In that case, the plaintiff wanted to proceed as a class, but the defendant objected because the plaintiff's claims were the same as those in a previous proposed class action that was dismissed voluntarily before the court decided whether the case should be certified as a class action.  The parties in <u>Sawyer</u> framed the issue the same way as the parties in this case, as a question of tolling, but the court rejected that approach: "the propriety of class certification in Sawyer's suit has nothing to do with tolling or <u>American Pipe</u>, and

10

everything to do with the preclusive effect of the first decision, plus a proper application of Rule 23's criteria."  Id. at 564.  Framing the question as one of issue preclusion, the court found no reason to bar the case from proceeding as a class.  "Because Park Bank [the plaintiff in the previous case] dismissed its suit before the state judge could decide whether to certify a class, that disposition does not carry any force for any class member other than Park Bank."  Id. at 564.

Defendant is quick to point out that the facts in Sawyer are distinguishable because the plaintiffs in Dukes did receive a ruling on their class certification motion.  This is true, but the argument misses the point, which is that the court of appeals rejected a view that the tolling rule in American Pipe should apply any differently to a class action than to an individual lawsuit.  That view is consistent with a discussion in an earlier case:

> Both Armstrong [v. Martin Marietta Corp., 138 F.3d 1374 (11th Cir.1998)] and Basch v. Ground Round, Inc., 139 F.3d 6 (1st Cir.1998), which holds that tolling from multiple unsuccessful class actions can't be "stacked," suggest that Crown, Cork & Seal sets the outer limit of the American Pipe doctrine. A concurring opinion by three Justices in Crown, Cork & Seal observed that the tolling doctrine "is a generous one, inviting abuse." 462 U.S. at 354 (Powell, J., concurring).  But the "abuse" about which these Justices expressed concern was raising new or peripheral claims only tangentially connected with the original class suit. As all nine Justices recognized, a complaint seeking certification as a class action notifies the defendant of the claim and the potential scope of relief. For many purposes *it is best to speak of such a complaint as satisfying, rather than tolling, the statute of limitations*.

Hemenway v. Peabody Coal Co., 159 F.3d 255, 266 (7th Cir. 1998).  In other words, once a plaintiff has filed a complaint that is timely under American Pipe, the tolling issue is resolved, regardless whether the plaintiff wishes to proceed individually or as a class.  Although the previous class action that failed may have implications on a new motion for

class certification, the statute of limitations is not one of them.

As noted in <u>Gomez v. St. Vincent Health, Inc.</u>, 622 F. Supp. 2d 710, 718-19 (S.D. Ind. 2008) (Hamilton, J.), the Supreme Court's reasons for adopting the tolling rule in <u>American Pipe</u> apply equally to both individual suits and class actions.  For example, a refusal to extend tolling to subsequent class actions would encourage protective lawsuits and undermine the efficiency that Rule 23 is designed to promote.  Judge Hamilton explained the consequences of adopting the rule that defendant is proposing in this case:

> The problem is that other potential plaintiffs who are waiting to see if a first class action will protect their rights may need to make a decision before the first court makes its decision [on class certification] . . . . The cautious approach would therefore be to go ahead and file the additional class action(s) before a denial.  A rule that creates that incentive seems to run contrary to the aim of <u>American Pipe</u> to avoid needless filings of repetitive claims. It also presents a risk of effectively binding absent class members by decisions in which they were not adequately represented.

<u>Id.</u> at 718-19.   Further, applying <u>American Pipe</u> to subsequent class actions does not undermine the purpose of the statute of limitations because defendants will already have notice of the claims and the "generic identities" of the class members at the time the second lawsuit is filed.   <u>Id.</u> at 722.   Although Judge Hamilton acknowledged that there were legitimate concerns about relitigating class issues, he concluded that limiting <u>American Pipe</u> to individual suits was not the way to address those concerns.   "The lesson of <u>American Pipe</u> and <u>Crown, Cork & Seal</u> is that tolling is appropriate for a second class action attempt, and the merits of that attempt can be addressed through application of principles of stare decisis and issue preclusion."  <u>Id.</u> at 723.

<u>Gomez</u> is persuasive and consistent with the decisions of both the Supreme Court and

the Court of Appeals for the Seventh Circuit.  Accordingly, I conclude that the statute of limitations does not bar plaintiffs from proceeding as a class.  Because defendant does not argue that issue preclusion or any kind of estoppel bars plaintiffs from proceeding as a class, I do not consider those issues.

## B.  Rule 23

Although it is usually the plaintiffs who move to certify the class under Fed. R. Civ. P. 23, any party may ask the court to determine whether class certification is appropriate. Blihovde v. St. Croix County, 219 F.R.D. 607, 612 (W.D. Wis. 2003).  See also Fed. R. Civ. P. 23(c)(1) (requiring courts to make certification decision "[a]t an early practicable time" without specifying the party who may request the decision).   However, if the defendant moves to dismiss the class allegations before discovery, the court must evaluate the motion using a standard similar to that of Fed. R. Civ. P. 12(b)(6).   Sjoblom v. Charter Communications, LLC,  2007 WL 4560541, *6 (W.D. Wis. 2007); Schilling v. Kenton County, Kentucky, 2011 WL 293759, *4 (E.D. Ky. 2011);  Bryant v. Food Lion, Inc., 774 F. Supp. 1484, 1495 (D.S.C. 1991).  See also General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1982) ("Sometimes . . . issues [regarding class certification] are plain enough from the pleadings.").  Under that standard, the plaintiffs' allegations must "state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  In the context of a determination under Rule 23, the question is whether plaintiffs' allegations are sufficient

13

to show that it is plausible that plaintiffs will be able to satisfy the Rule 23 requirements after conducting discovery.

Rule 23 includes several requirements for class certification, but defendant's motion is limited to one: whether "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This is the same requirement at issue in <u>Dukes</u>, 131 S. Ct. 2541, which the Court found to be lacking. Defendant argues that plaintiffs have not cured and cannot cure the deficiencies that the Court identified previously.

In <u>Dukes</u> the Court summarized the plaintiffs' theory of discrimination as follows:

> These plaintiffs, respondents here, do not allege that Wal–Mart has any express corporate policy against the advancement of women. Rather, they claim that their local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees. And, respondents say, because Wal–Mart is aware of this effect, its refusal to cabin its managers' authority amounts to disparate treatment.

<u>Id.</u> at 2548 (citations omitted).

The Court began its analysis under Rule 23(a)(2) by emphasizing that a common question is not established simply because each of the plaintiffs suffered a violation of the same law. <u>Id.</u> at 2551. Rather, the "claims must depend upon a common contention . . . that is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id.</u> In the context of that case, the Court stated that the plaintiffs needed to "produce a common answer to the crucial question *why was I disfavored*." <u>Id.</u> at 2552 (emphasis in original).

14

The Court identified two ways the plaintiffs could make that showing: (1) a biased testing procedure; or (2) a general policy of discrimination in which "the discrimination manifested itself . . . in the same general fashion." Id. at 2553. The Court stated that the plaintiffs' theory of discrimination was inconsistent with a finding of a biased testing procedure because "[t]he whole point of permitting discretionary decisionmaking is to avoid evaluating employees under a common standard." Id. In support of a general policy of discrimination, the plaintiffs cited a report of their expert, but the Court did not find it helpful because the expert "could not . . . determine with any specificity how regularly stereotypes play a meaningful role in employment decisions." Id.

The Court acknowledged that "giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" Id. at 2554 (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 990 (1988). However, the problem was that the plaintiffs had "not identified a common mode of exercising discretion that pervades the entire company." Id. at 2554-55. The plaintiffs relied on statistical data showing that defendant promoted women less often than men, but the Court rejected the data because it could not show how discretion was exercised at particular stores. Id. at 2555. In any event, even if there was a gender disparity, the Court held that the plaintiffs' class claims failed because the plaintiffs had not identified a "specific employment practice" that created the disparity. Id. An allegation of delegated discretion was not sufficient. Id.

15

Finally, the Court found that "120 affidavits reporting the experiences of discrimination—about 1 for every 12,500 class members" were not sufficient to show a general policy of discrimination.  Id.

Plaintiffs argue that Dukes is not controlling because of several differences in the proposed classes.  First, plaintiffs say that they have "refined" the class so that it includes only one region rather than the entire country, Plts.' Br., dkt. #29. at 20, but plaintiffs fail to explain how this change addresses any of the problems with the previous class.  Although the Court noted the class's large size, the Court did not suggest that certification should be denied because the class was too numerous.  By limiting the class geographically, plaintiffs simply have created a smaller version of the same problem.  Regardless whether the class is nationwide or encompasses only one part of the country, plaintiffs still face the same challenge, which is to identify "a common contention . . . that is capable of classwide resolution."  Dukes, 131 S. Ct. at 2551.  In other words, plaintiffs must show a policy or practice *at the regional level* that applies to the entire class.  In this regard, plaintiffs point to nothing in their complaint that is different from the allegations in Dukes.

Second, plaintiffs say that their proposed class focuses on a "core group of decision makers," Plts.' Br., dkt. #29, at 20, but this is just a different way of saying that plaintiffs have limited the size of the class to one region because the "core group" is simply the unidentified "Region 14 managers."  Plaintiffs cite a statement from Dukes, 131 S. Ct. at 2251, that an example of a common contention could be "the assertion of discriminatory bias on the part of the same supervisor," but plaintiffs have not identified one supervisor

16

that is responsible for all the decisions at issue in this case and they do not explain how the collective decisions of the "Region 14 managers" are linked except by the same "corporate culture" of gender bias that the Court found unpersuasive in <u>Dukes</u>.

Third, plaintiffs provide several anecdotes of discriminatory conduct that occurred within Region 14. Again, however, the problem is that plaintiffs do not show how these incidents can be tied together as part of a policy of discrimination. Plaintiffs include several allegations about discriminatory attitudes by Wal-Mart executives, but these seem to be the same allegations that plaintiffs made in <u>Dukes</u>. Plaintiffs do not explain why the allegations should be more persuasive in the context of this case.

Fourth, plaintiffs list what they identify as the common questions in this case:

- whether Defendant, through its Region 14 managers with final authority to make the challenged decisions, has engaged in a pattern or practice of discrimination in pay and management track promotions against its female employees in Region 14;

- whether Defendant, through its nationwide policies, including but not limited to, the Relocation Policy, Career Preferences Program, Pay Cap Policy, and Scheduling and Attendance Policies, as implemented and utilized by Region 14 management, has engaged in a pattern or practice of discrimination in pay and management track promotions against its female employees in Region 14;

- whether Defendant's nationwide policies, including but not limited to the Relocation Policy, Career Preference Policy, Pay Cap Policy, and Scheduling and Attendance Policies, as implemented and utilized by Region 14 management have had an adverse impact on the proposed class and if so whether this impact can be justified by business necessity;

- whether there are statistical patterns adverse to female employees in pay and management track promotions in Region 14;

17

- whether Defendant was aware of the impact of their nationwide policies and practices on its women employees;

- whether relief and punitive damages relief for the proposed classes are warranted.

Again, these are substantially the same questions identified in Dukes.  For example, in her dissent, Justice Ginsburg argued that the Court gave "no credence to the key dispute common to the class:  whether Wal-Mart's discretionary pay and promotion policies are discriminatory." Dukes, 131 S. Ct. at 2565 (Ginsburg, J., dissenting).  In particular, Justice Ginsburg noted the allegations that "the company relies on gender stereotypes in making employment decisions such as promotions and pay," that "Wal–Mart permits those prejudices to infect personnel decisions . . . by leaving pay and promotions in the hands of a nearly all male managerial workforce using arbitrary and subjective criteria," and that "alleged barriers to the advancement of female employees include the company's requirement, as a condition of promotion to management jobs, that employees be willing to relocate." Id. (alterations and internal quotations omitted).  In addition, she noted the lower court's findings that "[t]he selection of employees for promotion to in-store management is fairly characterized as a 'tap on the shoulder process,' in which managers have discretion about whose shoulders to tap" and that "[v]acancies are not regularly posted; from among those employees satisfying minimum qualifications, managers choose whom to promote on the basis of their own subjective impressions." Id.

Plaintiffs do not even attempt to distinguish the common questions they identify from those found lacking in Dukes.  In fact, most of their alleged common questions still

relate to "nationwide polices," not any policies of Region 14.

Plaintiffs cite <u>McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 672 F.3d 482, 489 (7th Cir. 2012), as support for their argument that their class allegations are sufficient for a disparate impact claim.   In <u>McReynolds</u>, the plaintiffs were brokers challenging two companywide policies at a firm, a "teaming" policy and an "account distribution" policy.   Under the teaming policy, brokers were permitted to form teams of their own choosing; under the account distribution policy, a departing broker's accounts were distributed according to the past success of the other brokers in a particular office.   The court concluded that the plaintiffs could challenge both policies under a disparate impact theory:

> If the teaming policy causes racial discrimination and is not justified by business necessity, then it violates Title VII as 'disparate impact' employment discrimination—and whether it causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination.

> And likewise with regard to account distributions: if as a result of racial preference at the team level black brokers employed by Merrill Lynch find it hard to join teams, or at least good teams, and as a result don't generate as much revenue or attract and retain as many clients as white brokers do, then they will not do well in the competition for account distributions either; and a kind of vicious cycle will set in. . . . This spiral effect attributable to company-wide policy and arguably disadvantageous to black brokers presents another question common to the class, along with the question whether, if the team-inflected account distribution system does have this disparate impact, it nevertheless is justified by business necessity.

<u>Id.</u> at 489-90.   The court distinguished <u>Dukes</u> on the ground that "permitting brokers to form their own teams and prescribing criteria for account distributions that favor the already successful . . . are practices of Merrill Lynch, rather than practices that local managers can

choose or not at their whim," which was the situation in <u>Dukes</u>.

In response, defendant cites <u>Bolden v. Walsh Construction Co.</u>, 688 F.3d 893, 895 (7th Cir. 2012), in which the plaintiffs were construction workers alleging discrimination in the assignment of overtime work and in working conditions at more than 250 sites. The court concluded that <u>Dukes</u> foreclosed a class action. "In <u>Wal–Mart</u>, as here, the plaintiffs contended that discretionary acts by local managers (of stores in <u>Wal–Mart</u>, of construction sites here) produced discriminatory effects. . . . [W]hen multiple managers exercise independent discretion, conditions at different stores (or sites) do not present a common question." <u>Id.</u> at 896. The court distinguished <u>McReynolds</u> on the ground that <u>McReynolds</u> was a challenge to company policies, but the only policy at issue in <u>Bolden</u> was "its grant of discretion to superintendents in assigning work and coping with offensive language or bigoted conduct." <u>Id.</u> at 897 (The court also noted several "policies" and "practices" identified by the plaintiffs, such as a "Policy/Practice of allowing foremen and supervisors to make promotion decisions without reference to any objective criteria," but the court concluded that these were simply different ways of delegating discretion. <u>Id.</u> at 898.)

<u>Dukes</u>, <u>McReynolds</u> and <u>Bolden</u> each involved decisions by a company to grant discretion to employees. In <u>McReynolds</u>, the court found that the delegation qualified as a company policy that could be challenged in a class action; in <u>Dukes</u> and <u>Bolden</u> the courts came to the opposite conclusion. Although there may be tension among these cases, plaintiffs cannot benefit from any inconsistency because plaintiffs' allegations are much more similar to <u>Dukes</u> and <u>Bolden</u> than they are to <u>McReynolds</u>. One important difference

20

between this case and McReynolds is that the plaintiffs in McReynolds focused on two discrete policies that applied equally to each class member.  The plaintiffs in this case (and Dukes) point to a hodgepodge of different alleged policies and practices that they say contribute to discrimination, but it would be impossible for all of the contributing factors to "produce a common answer to the crucial question *why was I disfavored*." Dukes, 131 S. Ct. at 2552 (emphasis in original).  Even the named plaintiffs in this case do not allege that many of the policies affected them personally.

By challenging so many different matters in the same case, plaintiffs have made it impossible to craft a cohesive class.  In other words, unlike the plaintiffs in McReynolds, the plaintiffs in this case have "not identified a common mode of exercising discretion that pervades the entire company," id. at 2554-55, or a "specific employment practice" that created the disparity.  Id. at 2555.

In Bolden, the court of appeals hinted at the appropriate scope of a class in a case like this.  In summarizing Dukes, the court of appeals stated that "the Court held that a class including all stores could not be certified. *One class per store may be possible*; one class per company is not."   Bolden, 688 F.3d at 897 (emphasis added).  Rather than seek to limit the scope of the national class to a discrete policy (such as the relocation requirement) or to a more cohesive group (such as the employees at one store), plaintiffs chose instead to narrow the class arbitrarily without addressing any problems identified by the Supreme Court.

Plaintiffs cite a number of district court cases in their brief for the proposition that

courts should be wary of making a definitive determination about class certification at the pleading stage.  I agree that it is the rare case in which it is clear from the pleadings that the plaintiffs may not proceed as a class, but this is one of those cases because plaintiffs have not alleged "more than a sheer possibility" that they can distinguish their proposed class from the class rejected in Dukes.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  See also Pilgrim v. Universal Health Card, LLC, 660 F.3d 943, 949 (6th Cir. 2011) ("That the motion to strike came before the plaintiffs had filed a motion to certify the class does not by itself make the court's decision reversibly premature."); Scott v. Family Dollar Stores, Inc., 2012 WL 113657, *4 (W.D.N.C. 2012) (dismissing class allegations at pleading stage because "the plaintiffs in Dukes presented virtually identical claims as plaintiffs in this lawsuit"). Particularly because plaintiffs do not explain how discovery could make a difference to the issue of certification in this case, I see no reason to delay the inevitable.

ORDER

IT IS ORDERED that

1.  Defendant Wal-Mart Stores, Inc.'s motion to dismiss the complaint as to the class allegations, dkt. #16, is GRANTED.

2.  Defendant's motions to take judicial notice, dkt. ##18 and 32, are DENIED as

unnecessary.

Entered this 24th day of May, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge